1
2
3
4
5
6
7
8
9
10
11
12
13
14

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

EVIE OQUENDO,

                Plaintiff,

    v.

LAS VEGAS METROPOLITAN POLICE
DEPARTMENT, et al.,

                Defendants.

Case No. 2:11-cv-00698-MMD-PAL

ORDER

(Defendants' Motion for Summary
Judgment – dkt. no. 26)

15
**I.**     **SUMMARY**

16
      Before the Court is Defendants' Las Vegas Metropolitan Police Department

17
("LVMPD") and Officer Derek Colling's Motion for Summary Judgment.  (Dkt. no. 26.)

18
For the reasons stated below, the Motion is granted in part and denied in part.

19
**II.**     **BACKGROUND**[1]

20
      This case involves the use of deadly force by LVMPD Officer Derek Colling

21
against the deceased, Tanner Chamberlain.  On September 22, 2009, 15-year-old

22
Chamberlain and his mother, Evie Oquendo, got in an argument because Oquendo

23
would not let Chamberlain go over to a friend's home.  Oquendo later testified that

24
Chamberlain became extremely angry with her, and that he repeatedly struck Oquendo

25
before the police arrived on the scene.  Chamberlain had previously been diagnosed

26
with bipolar disorder but was not taking medication before the altercation.  However,

27

28
        [1] Unless otherwise stated, the provided facts are undisputed.

after the violent altercation with his mother, he took ten pills from his mother's prescribed anti-anxiety medication.  At this point, Chamberlain's rage subsided, and Oquendo called her sister, a retired law enforcement officer, to inform her about the fight.  The sister in turn called a family friend, who called 911 and reported the situation at 5:13 PM.   After calling her sister, Oquendo and Chamberlain took a walk outside.  Chamberlain brought a knife with him on the walk.  Chamberlain's knife was a black, folding knife with a three and one-half inch blade.  (*See* dkt. no. 27, "LVMPD000429.")  The blade on the long-edged side was jagged and the back side at the top was partly edged and had a hook coming to a sharp point.  (*See id.*)

LVMPD placed a call for service after receiving the family friend's call.  The call was broadcast to the police as a fifteen-year-old bipolar male threatening his mother with a knife.  The Crisis Intervention Team ("CIT") was requested, and Officer Steven Mauri, a CIT officer, was assigned to the case.  Officers Derek Colling and San Martin were on patrol together that evening, and riding in their vehicle near Oquendo's apartment when the call was broadcast.  Officers Colling and Martin were assigned to the call along with several other units.

The time between the LVMPD's first encountering Chamberlain and Officer Colling shooting and killing Chamberlain is less than a minute, and several events occurred in short succession.  Colling and Martin[2] were the first two officers to make visual contact with Chamberlain in the middle of his apartment complex.  When the police officers arrived and began advancing towards Chamberlain, Chamberlain took hold of his mother with a knife in his hand.  The parties dispute whether the knife point was ever at Oquendo's throat, or whether Chamberlain held the knife in his hand, but not at or near Oquendo's neck or face.  In either scenario, Chamberlain held the knife in his hand while forcibly pulling his mother in front of him, using her as a shield from the police. Officer Martin gave a series of commands to Chamberlain to drop the knife.

---

[2]Martin had received training to be certified as a CIT officer.

1   Chamberlain did not comply, but did not verbally respond or make any verbal threats.

2   Several other officers, including Officer Mauri, arrived on the scene.  However, after

3   Officer Colling yelled "crossfire," the officers moved out of Officer Colling's line of fire.

4   At approximately this point, Officer Martin drew his TASER and Officer Colling drew his

5   service weapon.  Chamberlain backed away and pulled Oquendo, trying to conceal his

6   head behind hers.  Chamberlain and Oquendo appeared to stumble as Chamberlain

7   forced Oquendo backward and, according to Defendants, raised his knife to her head

8   and face.  Officer Mauri, who had also arrived on the scene, told Chamberlain, "Let me

9   talk to you, let me talk to you." (Ex. 7 at 83.)  Oquendo shouted at the police not to shoot

10  her son.  Chamberlain looked to his left toward Officer Mauri, and raised his right hand

11  (the hand holding the knife) upward, exposing himself to a shot from Officer Colling.

12  Officer Colling then fired his weapon, striking Chamberlain in the head and killing him.

13  The last ten seconds of the encounter was captured on video with a camera attached to

14  Officer Martin's TASER gun.[3]  Officer Colling shot Chamberlain within one minute of the

15  officers arriving on the scene.

16          After the incident, Officer Martin took Oquendo from the scene.  He walked her to

17  the parking lot and handed her to another officer. Detective McNett obtained a voluntary

18  statement from Oquendo at 7:07 PM. Oquendo asserts that she was wrongfully

19  detained by the LVMPD for over three hours after her son's shooting, after which point

20  she was transported to a nearby hospital.

21          Plaintiffs Oquendo and the Estate of Tanner Chamberlain ("Estate") filed suit on

22  May 2, 2011. Plaintiffs brought suit against Defendants LVMPD and Colling for

23  violations of Chamberlain's civil rights to life and security of person and violation of

24  Oquendo's civil right to familial relationships, 42 U.S.C. § 1983.  Plaintiffs also bring one

25

26          [3]The Court has reviewed the video evidence (dkt. no. 27, ex. I) and determines
    the evidence does not clearly lend support for either party's version of the facts,
27  primarily because it is unclear from the video how close the knife is to Oquendo's neck.
    It is also not clear from the video whether Oquendo is controlling Chamberlain's knife-
28  holding arm, as Plaintiffs assert.

3

count of municipal liability under *Monell*, alleging that the LVMPD perpetuated a policy, practice, or custom of tolerating and ratifying the use of excessive force and engaging in negligent hiring and supervision.  Plaintiffs also raise several state law claims, including wrongful death, negligence, and negligent supervision and training. Finally, Plaintiff Oquendo sues Defendants in her individual capacity for an alleged unconstitutional seizure and false imprisonment, for allegedly being detailed without consent for an extended time during the investigation of the shooting.

## III.    LEGAL STANDARD

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court.  *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).  Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986).  An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate.  *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).  "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"  *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (*quoting First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968)).  In evaluating a summary judgment motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party.  *Kaiser Cement Corp. v.  Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

///

///

4

The moving party bears the burden of showing that there are no genuine issues of material fact.  *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982).  "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 256.  The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank of Am.*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient."  *Anderson*, 477 U.S. at 252.

**IV.  42 U.S.C. § 1983 Claims**

**A.    42 U.S.C. § 1983**

42 U.S.C. § 1983 provides a mechanism for the private enforcement of substantive rights conferred by the Constitution and federal statutes. *Graham v. Connor*, 490 U.S. 386, 393-94 (1989).  Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (*quoting Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).  To state a claim under § 1983, a plaintiff "must allege the violation of a right secured by the Constitution and the laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of law."  *West v. Atkins*, 487 U.S. 42, 48-49 (1988).  Here, Plaintiffs rely on substantive rights conferred by the Fourth Amendment.

**B.     Excessive Force**[4]

An objectively unreasonable use of force violates the Fourth Amendment's prohibition against unreasonable seizures. *Torres v. City of Madera*, 648 F.3d 1119, 1123-24 (9th Cir. 2011).  To prevail on an excessive force claim under § 1983, a plaintiff must establish that the use of force at issue was objectively unreasonable under the Fourth Amendment as determined by "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal quotation marks omitted).

Courts consider (1) how severe the crime at issue is, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Id.*  Courts also consider "any other exigent circumstances that existed at the time of the arrest." *Derole v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001) (quotation marks, citations, and brackets omitted).  Moreover, a "police officer may reasonably use deadly force where he has probable cause to believe that the suspect posses a threat of serious physical harm, whether to the officer or to others."  *Billington v. Smith*, 292 F.3d 1177, 1184 (9th Cir. 2002).

The Court must determine whether the force used by Officer Colling was "objectively reasonable" as "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396-97 (citations omitted).

---

[4]As discussed below, Defendants argue that qualified immunity shields Officer Colling from liability.  In *Saucier v. Katz*, 533 U.S. 194, 201 (2001), the Supreme Court mandated a two-step sequence for resolving qualified immunity claims: first, determine whether the defendant violated the plaintiff's constitutional right, and second, determine whether that right was "clearly established" at the time of defendant's alleged misconduct.  However, the Supreme Court recently held that the *Saucier* protocol is no longer mandatory. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). The Supreme Court left the order of decision to the "sound discretion" of district court judges.  *Id.*  The Court chooses to follow the *Saucier* protocol in this case.

### 1.    Local Rule 56-1

Pursuant to Local Rule 56-1, both parties provided a short statement setting forth each fact material to the disposition of the Motion.  Below, the Court summarizes what it considers to be the relevant disputed issues of fact on Plaintiffs' excessive force claim:

- Defendants' assertions:
    - Officer Colling used deadly force after he saw the mentally ill Chamberlain take a hostage at knife point, fail to respond to commands to drop the knife or calm down, and continue to display aggressive conduct while holding a knife at or very near Oquendo's head and throat;
    - Office Colling had probable cause to believe Chamberlain posed a deadly threat to Oquendo at the time Colling fired a shot at Chamberlain.

- Plaintiffs' assertions:
    - The LVMPD knew at the time of the incident that Chamberlain was having a bipolar domestic incident with his mother, but did not give the CIT officers time to implement their training prior to shooting and killing Chamberlain;
    - Chamberlain made no verbal threats towards officers or towards his mother at the time Colling shot Chamberlain;
    - The knife was not touching Oquendo's neck while the Officers were present, and in fact Oquendo was controlling the hand that Chamberlain had the knife in;
    - Chamberlain was turning his head towards Officer Mauri, in compliance with Mauri's commands;[5]
    - Officer Colling shot Chamberlain within 10-15 seconds after making visual contact with Chamberlain, and within 2-5 seconds of "being on target," thus using deadly force as a first rather than last resort;
    - Officer Colling did not give Chamberlain any warnings prior to using deadly force.

### 2.    Nature and Quality of Intrusion

Courts assess the quantum of force used by considering "the type and amount of force inflicted."  *Headwaters Forest Def. v. Cnty. of Humboldt*, 240 F.3d 1185, 1198 (9th Cir. 2000)(*vacated and remanded on other grounds sub nom. Cnty. of Humboldt v. Headwaters Forest Def.*, 534 U.S. 801 (2001) (internal quotation marks omitted)).

---

[5]The Court cannot determine whether that the video supports this assertion.

The type of force inflicted here was deadly force. "[N]otwithstanding probable cause to seize a suspect, an officer may not always do so by killing him." *Tennessee v. Garner*, 471 U.S. 1, 9 (1985). "The intrusiveness of a seizure by means of deadly force is unmatched." *Id.* "The use of deadly force . . . frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment." *Id.* This highly intrusive seizure must be weighed against the other *Graham* factors to determine whether a reasonable officer in Officer Colling's position would have had probable cause to believe that Chamberlain posed a threat of serious physical harm to the officer or to Oquendo. *See Billington*, 292 F.3d at 1184.

### 3.   Government Interests at Stake

There exist several genuine issues of material fact regarding the *Graham* factors here.   First, the parties dispute how severe the crime at issue was.   Defendants describe Chamberlain as having taken Oquendo "hostage," holding a knife to her neck. Plaintiffs assert that Chamberlain was holding a knife, but was not attempting to stab his mother.   In fact, Defendants state that the knife was "at or near" Oquendo's neck and head.   Moreover, the parties agree that Chamberlain was not verbally threatening his mother, and Plaintiffs assert that Oquendo appeared to be controlling the hand that Chamberlain had the knife in.

Regarding the second factor, while Chamberlain posed an immediate threat to his mother, he did not pose an immediate threat to the officers. This therefore distinguishes the present case from the several cases cited by Defendants (*see* dkt. no. 48 at 8, n.8) holding that the use of deadly force is reasonable when a suspect threatens an officer with immediate physical force.  The fact that the officers' lives were not in danger makes it more likely that a reasonable officer in Colling's position would have waited to use deadly force or considered alternate means to deadly force, such as tasing Chamberlain, as Officer Colling did not have to fight against Chamberlain for his life.  This distinction is discussed in greater detail *infra*, where the Court addresses the case law cited by Defendants. Third, it is not evident that Chamberlain was actively

resisting arrest or attempting to evade arrest.  He arguably was using his mother as a shield against arrest, but when the police approached, he did not run; in fact he backed up towards a planted area in front of an exterior wall.  (S*ee* dkt. no. 27, ex. I.)  Plaintiffs state that Chamberlain was experiencing a bipolar episode rather than attempting to escape, and that he was confused by the multiple officer's commands. Given that Officer Colling knew he was responding to a domestic disturbance involving a bipolar teenager, a reasonable juror could determine that Officer Colling's belief that Chamberlain was actively resisting or evading arrest was not objectively reasonable.

Defendants, however, argue that Officer Colling's decision was objectively reasonable because Chamberlain held his mother in a life-threatening position. Defendants cite to *Ting v. United States*, 927 F.2d 1504, 1510 (9th Cir. 1991) for the proposition that when an "officer has probable cause to believe that a suspect poses a significant threat of death or serious physical injury to the officer or others," the officer may use deadly force.  However, the quote in *Ting*, citing a block quote from *Garner*, merely states that it is not constitutionally *unreasonable* to use deadly force if the suspect threatens the officer or others – not that such use of force is plainly *reasonable*. *Id.*  ("Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, *it is not constitutionally unreasonable* to prevent escape by using deadly force.  Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force *may be* used if necessary to prevent escape, and if, where feasible, some warning has been given.") (*citing Garner*, 471 U.S. at 11-12) (emphasis added)).  Moreover, the quoted portion of *Garner* refers to using deadly force when the suspect is attempting escape; as stated, it is not clear from the record that Chamberlain was attempting to escape.

Finally, considering the totality of the circumstances, the Court cannot determine that, as a matter of law, Officer Colling's decision to use deadly force was reasonable.

1   Officer Colling did not provide a warning to Chamberlain that he would shoot. Such a

2   warning is required under LVMPD protocol where feasible, and it is not clear that it was

3   not feasible to give a warning in this situation.  (Dkt. no. 26-12, ex. L, at 6).  Officer

4   Colling did not provide time for the CIT officers to follow CIT policy, which states that

5   CIT officers on the scene should direct police activities based on their training and the

6   information provided to them about the mentally ill person and the situation s/he is in.

7   The evidence demonstrates that Officer Colling knew that a CIT officer (Officer Mauri)

8   was either on the scene or on his way to the scene, yet Officer Colling did not wait for

9   the CIT officer to have the opportunity to talk Chamberlain down.  *Cf. Derole*, 272 F.3d

10  at 1282[6] (noting that use of force against a mentally disabled individual was not

11  appropriate when deputies trained in crisis negotiations were on their way to the crime

12  scene).  Further, Oquendo told the officers not to shoot her son.  A reasonable juror

13  could determine that Oquendo was the person with the most knowledge about the

14  situation, and that she was not in an objectively life-threatening situation because she

15  told the officers not to shoot.  Moreover, it is not clear where the knife blade was

16  positioned; while Plaintiffs assert it was in Chamberlain's hand, Defendants assert that it

17  was at or near her neck.

18      Defendants have not demonstrated as a matter of law that it was reasonable for

19  Officer Colling to disregard LVMPD policy and procedure by not giving Chamberlain a

20  warning before shooting and ignoring the CIT protocol. Notwithstanding Officer Colling's

21  testimony regarding why he believed shooting Chamberlain was justified, the hasty

22  decision to shoot Chamberlain before the other CIT officers had more than a minute to

23  speak to Chamberlain is not objectively reasonable.  The Court cannot determine that

24  Officer Colling's decision to shoot Chamberlain within one minute of arriving on the

25

26      [6] The plaintiff in *Derole* was seriously injured from a bean-bag ammunition shot at
    his face. 272 F.3d at 1278. The *Derole* plaintiff was mentally disturbed, verbally abusive,
27  but physically compliant. *Id.* at 1276-77. The officer shot him without warning as the
    plaintiff walked toward him with no weapons in hand and with a steady gait.  *Id.* at 1277-
28  78.

scene was objectively reasonable, especially when no officers' lives were in danger and less deadly alternatives may have been available.[7] Plaintiffs have raised genuine issues of fact which remain concerning whether a reasonable officer in Officer Colling's position would have probable cause to use deadly force in this situation.

This case is distinguishable from the two primary cases Defendants rely upon, *Billington v. Smith*, 292 F.3d 1177, and *Blanford v. Sacramento County*, 406 F.3d 1110 (9th Cir. 2005).  In *Billington*, a police officer was locked in hand-to-hand combat with the deceased, who "actively, violently, and successfully resisted arrest and physically attacked" the police officer who killed him.  292 F.3d at 1177.  There, "[n]o one who saw the fight disputes that [the deceased] was the aggressor," and it was clear to the court that the deceased posed "an imminent threat of injury or death" to the police officer.  *Id.* Here, by contrast, there are facts in dispute about how much of a danger Chamberlain posed to his mother, and it is undisputed that Chamberlain posed no immediate threat to the officers. Thus, unlike in *Billington*, it is not obvious that the threat Chamberlain posed to his mother justified using deadly force, especially in light of the fact that the officers were not in imminent danger and his mother asked the officers not to shoot her son.  *See id.*

This case is also distinguishable from *Blanford*, where the suspect was "armed with a dangerous weapon, was told to stop and drop it [the weapon], was warned that he would be shot if he didn't comply, appeared to flaunt the deputies' commands by raising the sword and grunting, refused to let go of the sword, and was intent upon trying to get inside a private residence or its backyard with the sword in hand."  406 F.3d at 1119.  While in *Blanford*, the officers had a meaningful opportunity to speak to the suspect and develop a rapport, despite the fact that they were in harm's way, here, the officers shot Chamberlain within a minute of arriving on the scene without providing any

---

[7]The Court disagrees with Defendants that the ten seconds of video in this case make clear that the decedent was given sufficient opportunity to comply.  (*See* dkt. no. 27, ex. I.)

warning to him. Though Chamberlain appeared nonresponsive at first, there is a genuine issue of material fact regarding whether Chamberlain responded to Officer Mauri's commands.  In fact, Defendants state that Chamberlain looked towards his left toward Officer Mauri, clearing the way for Officer Colling's shot. The Court cannot determine as a matter of law from the video evidence whether Chamberlain was nearing compliance at the moment Officer Colling shot him. But more importantly for the purposes of this Motion, the Court cannot determine that the threat to the officers or Oquendo was so obvious that Officer Colling's use of force was akin to the reasonable force used in *Blanford*, where the Officers warned the suspect several times to drop his sword and informed the suspect they would shoot. 406 F.3d at 1113.  Most notably, the officers in *Blanford* waited several minutes and used deadly force only when they feared the suspect was entering a neighbor's property with a deadly weapon; here, Officer Colling shot Chamberlain within one minute of arriving on the scene, and before the CIT-trained Officer Mauri had the opportunity to say more than a few words to Chamberlain. *See id.*

Given the number of disputed facts regarding the immediacy of the danger Chamberlain posed to his mother, the fact that Chamberlain posed no immediate threat to the LVMPD officers on the scene, and the severity of the force used by Colling, as well as other factors listed above, the Court determines that there are several issues of material fact on Plaintiffs' excessive force claim.  The number of disputed facts, coupled with the Ninth Circuit's repeated admonishment that "the reasonableness of force used is ordinarily a question of fact for the jury[,]" make summary judgment inappropriate. *See Liston v. Cnty. of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997) (*citing Alexander v. County of Los Angeles*, 64 F.3d 1315, 1322 (9th Cir. 1995); *Forrester v. City of San Diego*, 25 F.3d 804, 806 (9th Cir. 1994); *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994); *Barlow v. Ground*, 943 F.2d 1132, 1135 (9th Cir. 1991)).  The facts of this case demonstrate that Chamberlain held Oquendo in a threatening position, but exactly how

///

threatening — and whether that threat justified using deadly force as a first resort — is a question best answered by a jury, not the Court.

### C. Qualified Immunity

Even if a constitutional violation is shown, the plaintiff "bears the burden of proving that the rights [he] claims were 'clearly established at the time of the alleged violation." *Robinson v. York*, 566 F.3d 817, 826 (9th Cir. 2009) (*quoting Moran v. State of Wash.*, 147 F.3d 839, 844 (9th Cir. 1998)). The pertinent inquiry is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (citation omitted). "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Id.* (citation omitted).

As explained above, the Ninth Circuit recognizes the right to be free from excessive, deadly force. Defendants assert that "there exists no legal basis to suggest an otherwise lawful use of deadly force is rendered constitutionally repugnant because a hostage taken as a human shield tells the officer 'don't shoot.'" (Dkt. no. 48 at 4.) However, Defendants too narrowly define the legal right. Rather, a reasonable officer in Officer Colling's position "certainly would have known from *Garner* and *Graham* that shooting" Chamberlain "required probable cause (supported by objectively reasonable facts) to believe that he posed a threat of serious physical harm to themselves or others . . . ." *Blanford*, 406 F.3d 1110.

Defendants argue that deadly force was the only reasonable force to use here because: (1) Chamberlain used Oquendo as a body shield, rendering incapacitation by TASER both ineffective and likely to lead to Oquendo's injury both by Chamberlain and the TASER dart; (2) Plaintiffs cannot point to any alternative reasonably likely to lead to apprehension before Chamberlain could cause further harm; and (3) that the Fourth Amendment does not require law enforcement officers to exhaust every alternative

///

///

1    before using justifiable deadly force.[8] Defendants are incorrect about point (2) –
2    Plaintiffs argue that Officer Martin could have used his TASER to render Chamberlain
3    incapable of further threat or resistance.  Regarding point (1), the evidence Defendants
4    point to is the deposition testimony of D.P. Van Blaricom, Plaintiffs' expert witness.
5    (Dkt. no. 48, 27-29.)  However, Blaricom's testimony does not clearly state that using a
6    TASER would have been ineffective. (*See id.*) Moreover, Blaricom's expert report
7    determined that Officer Colling prematurely and unreasonably used deadly force, in part
8    because Officer Martin had deployed his TASER and was in the process of
9    maneuvering to fire the TASER when Officer Colling shot Chamberlain. (Dkt. no. 39 at
10   53-54.)

11       Finally, Defendants are correct that the Fourth Amendment does not require
12   officers to exhaust every alternative before using justifiable deadly force.  *See Scott*, 39
13   F.3d at 915 (9th Cir. 1994) (police officers "need not avail themselves of the least
14   intrusive means of responding to an exigent situation; they need only act within that
15   range of conduct we identify as reasonable.").  However, the Fourth Amendment *does*
16   require officers to refrain from taking actions they know are unlawful given the situation
17   he or she is confronted with. *See Saucier*, 533 U.S. at 202.  Accepting Defendants'
18   version of the facts as true *might* lead to the conclusion that Officer Colling acted
19   reasonably, but on summary judgment, the Court must consider the facts in a light most
20   favorable to the non-moving party.  *Kaiser*, 793 F.2d at 1103.  Under Plaintiffs' version
21   of the facts, if Chamberlain did not have the knife at Oquendo's neck or head, if
22   Oquendo was guiding or partially directing Chamberlain's hand, or if Chamberlain was
23   nearing compliance with the officers' commands, it is less obvious that a reasonable
24   officer in Colling's position would understand the decision to use deadly force was
25   lawful.  *See e.g., Torres v. City of Los Angeles*, 548 F.3d 1197, 1210-11 (9th Cir. 2008)
26   (noting that where "historical facts material to the qualified immunity determination are in

---

27
28        [8]Defendants also argue that a § 1983 plaintiff does not pierce an officer's
     immunity with evidence of negligent tactics.

dispute," summary judgment is inappropriate).   This is especially true in light of Plaintiffs' expert testimony, which states that Officer Colling did not act reasonably here. (Dkt. no. 39 at 53.) For these reasons, the Court denies Defendants' Motion for Summary Judgment on qualified immunity grounds.

### D.   Interference with Familial Relations

The Ninth Circuit recognizes "that parents have a Fourteenth Amendment liberty interest in the companionship and society of their children." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) (*citing Curnow ex rel. Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991)). "Official conduct that 'shocks the conscience' in depriving parents of that interest is cognizable as a violation of due process." *Wilkinson*, 610 F.3d at 554 (citation omitted).  "In determining whether excessive force shocks the conscience, the court must first ask whether the circumstances are such that actual deliberation [by the officer] is practical." *Id.* (quotation marks and citations omitted). "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience." *Id.*  "On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Id.* "For example, a purpose to harm might be found where an officer uses force to bully a suspect or 'get even.'" *Id.*

"Whether a claim should be analyzed under the deliberate indifference standard or purpose to harm standard depends upon the degree to which, under the circumstances, actual deliberation is practical." *Wilkinson*, 610 F.3d at 554. " The Ninth Circuit counsels that 'our cases. . . require that when an officer encounters fast paced circumstances presenting competing public safety obligations, the purpose to harm

///

///

///

///

15

1    standard must apply.'"[9]  *Johnson v. Bay Area Rapid Trans.*, 790 F. Supp. 2d 1034, 1066

2    (N.D. Cal. 2011) (*citing Porter v. Osborn*, 546 F.3d 1131, 1139 (9th Cir. 2008)).

3          The Court agrees with Defendants that deliberation was not practical here under

4    the standard articulated above, because the moment the officers arrived at the scene,

5    Chamberlain took his mother hostage.   The Court must therefore determine whether

6    Colling's snap judgment due to the escalating situation he encountered on the afternoon

7    in question shocks the conscience.

8          There  is  no  evidence  that  Officer  Colling  had  any  motive  for  shooting

9    Chamberlain  apart  from  legitimate  law  enforcement  objectives.  Plaintiffs'  primary

10   argument on this point is that Colling intended to kill Chamberlain by not waiting for the

11   CIT officers on the scene to calm Chamberlain down.   While this decision may not have

12   been reasonable or lawful, it does not demonstrate that Colling shot Chamberlain in an

13   attempt to bully him or to get even.   Defendants' Motion for Summary Judgment on this

14   claim is accordingly granted.

15         **E.     Unlawful Detention**

16         Defendants argue that Officer Colling had no personal involvement in Oquendo's

17   removal from the scene of the incident and alleged restriction of her movement during

18   the investigation.  Plaintiffs admit that Officer Colling was not involved in Oquendo's

19   alleged  unlawful  detention  *after*  he  shot  Chamberlain.  Rather,  Plaintiffs  argue  that

20   Officer Colling is responsible for what occurred after the incident because his use of

21

22              [9]For example, in *Porter*, the court

23              found that actual deliberation was not practical where a five-minute altercation
             between the officers and victim evolved quickly and forced the officers to
24              make "repeated split-second decisions." 546 F.3d at 1139. The court noted
             that "deliberation" should not be interpreted in the narrow, technical sense,
25              reasoning that the Supreme Court had rejected the deliberate indifference
             standard even in cases where an officer giving chase could have deliberated
26              while pursuing the suspect. *Id.* at 1139-40. Instead, the heightened purpose-
             to-harm standard applies where a suspect's evasive actions force the officers
27              to act quickly.

28   *Wilkinson*, 610 F.3d at 554 (9th Cir. 2010) (*citing Porter*).

force has a causal nexus to her seizure, because had it not been for Officer Colling's shooting Chamberlain, Oquendo would not have been detained as a witness.  However, Plaintiffs cite to no case law supporting this contention.  (Dkt. no. 30 at 22-23.)   Liability under § 1983 "must be based on a defendant's personal involvement in the alleged constitutional wrong." *Mackinney v. Nielsen*, 69 F.3d 1002, 1008 (9th Cir. 1995). Oquendo therefore cannot sustain a claim for unreasonable seizure based on Officer Colling's conduct.

Plaintiffs alternatively argue that (1) the LVMPD can be held liable as a group for wrongfully detaining Oquendo; and/or (2) LVMPD leadership should have trained their officers regarding the proper amount of time a witness can be detained. However, imposing group liability is neither practical nor appropriate here, where Plaintiffs do not state that an entire *group* wrongfully detained Oquendo, but rather admit that they could not discover which LVMPD officer(s) or detective(s) was involved.  (*See* dkt. no. 30 at 23.)  And as to point (2), this claim is properly brought as a failure to train cause of action, and is not a cognizable theory on Oquendo's unreasonable seizure claim.

Defendants' Motion for Summary Judgment on Plaintiffs' cause of action for her unlawful detention is therefore granted.

### F.   *Monell* Claims

Plaintiffs bring three *Monell* claims against the LVMPD, alleging that: (1) the LVMPD has a policy, practice, or custom tolerating and ratifying the use of excessive, unreasonable, and deadly force by its officers; (2) that the LVMPD has a policy, practice, or custom of negligently hiring, training, and supervising its officers, agents, and employees; and (3) that the LVMPD failed to properly train its officers regarding the proper amount of time a witness may be detained. Regarding point (3), as described *supra*, Oquendo has no viable cause of action for unreasonable seizure for her detainment.  As Oquendo fails to establish a constitutional wrong, she has no attendant *Monell* claim.  The Court next addresses Plaintiffs' two other theories of *Monell* liability.

///

"Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 691 (1978). *Monell* instructs that in order to impose liability on a municipality or a subdivision of the municipality under § 1983, a plaintiff must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Bd. of Cnty. Com'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 403 (1997). "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Id.* at 403-04 (citations omitted). "Similarly, an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decision maker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Id.* at 404 (citations omitted).

Except in cases of deliberate indifference, a single constitutional violation, undertaken by a state actor without final policy making authority — as Officer Colling was here — is not sufficient to establish a longstanding practice or custom for the purposes of *Monell* liability.[10] *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999).

### 1.    Deliberate Indifference

Plaintiffs assert that LVMPD Sheriff Gillespie was deliberately indifferent to the hiring, training and supervision of LVMPD officers, resulting in an unofficial custom of using excessive force in a disproportionate and inappropriate fashion.

Deliberately indifferent training may give rise to § 1983 liability. *City of Canton v. Harris*, 489 U.S. 378 (1989). "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a *known or obvious* consequence of his action." *Christie*, 176 F.3d at 1240. A municipality is liable for deliberate indifference when "the need for more or different training is so obvious, and the inadequacy so likely

---

[10]Nor do Plaintiffs argue that one exception to the single-incident rule, ratification, was present here.

to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  *Merritt v. Cnty. of Los Angeles*, 875 F.2d 765, 770 (9th Cir. 1989).

Plaintiffs point to several newspaper articles regarding the LVMPD's poor history of officer shootings to argue that Defendants have a "widespread practice and custom of 'shoot first and justify later.'" (Dkt. no. 30 at 19.) The newspaper articles present evidence that the Las Vegas Review Journal conducted a year-long investigation of LVMPD, and determined that LVMPD officers tend to shoot more often than their counterparts in comparable cities. (*See* dkt. no. 21.)  Plaintiffs also present evidence of LVMPD's revamped "use of force policy" to demonstrate that the Sheriff was on notice that the written policy at the time Chamberlain was shot was not being implemented properly by LVMPD.  The new policy states that all other lesser alternatives should be reasonably considered and exhausted before an officer uses deadly force.  (*See* dkt. no. 39 at 29, part (E)(4).)[11]

Defendants argue that the articles cannot support Plaintiffs' assertions because newspaper "articles themselves, unsubstantiated by testimony, may show no more than notice to the city that allegations had been made, but [are not] admissible to prove the truth of the allegations of excessive force."  *Handle v. City of Little Rock*, 772 F. Supp. 434, 437 (E.D. Ark. 1991). Under this standard, the articles were sufficient to place LVMPD on notice of allegations that it engaged in negligent hiring, training, and/or supervision of its officers.  Moreover, "[a]t the summary judgment stage, [courts] do not focus on the admissibility of the evidence's form," but "on the admissibility of its contents."  *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003).  It is not obvious to the Court that the contents of the articles are inadmissible, so they are properly considered on this motion for summary judgment. The newspaper articles present a

---

[11]The prior policy does not contain the same language, though it does caution that deadly force may be used to protect officers or others from what is reasonably believed to be an immediate threat of death or serious bodily harm. (*See* dkt. no. 26-12, ex. L, at 6.)

genuine issue of material fact regarding whether LVMPD had an unofficial policy of negligently hiring, training, and/or supervising its officers, resulting in the unnecessary use of excessive force. The articles and the new policy, taken together, may have reasonably placed the LVMPD on notice of its negligent hiring, training and supervision of LVMPD officers. The Court accordingly denies Defendants' Motion for Summary Judgment on this claim.

### 2.    Custom or Practice of Using Excessive Force

Plaintiffs also use the newspaper articles and a new policy adopted by LVMPD to argue that LVMPD officers have a custom of unreasonably using excessive force.

"[O]nly deprivations visited pursuant to municipal 'custom' or 'policy'. . .  lead to municipal liability." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 818 (1985) (citation omitted).  A "decision to adopt [a] particular course of action . . . by th[e] government's authorized decisionmakers . . . surely represents an act of official government 'policy.'" *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986).  A policy is "a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* at 483-84.

The Court determines that Defendants did not provide sufficient authority or argument to support summary judgment on this claim. Their briefings focus on why Plaintiffs' allegations fall short of deliberate indifference to the negligent hiring, training, and supervision of LVMPD officers.  Defendants do not describe why the newspaper articles and/or the new use of force policy are insufficient to create genuine issues of fact regarding whether or not LVMPD officials adopted a custom of tolerating the unreasonable use of excessive force.  As Defendants carry the burden of persuasion on summary judgment, the Court cannot determine that this claim should be dismissed as a matter of law.

///

///

## V.      STATE LAW CLAIMS

### A.      Wrongful Death

The Court agrees with Defendants that the fourth and fifth claims, for wrongful death and negligence, are properly conceived of as one cause of action for wrongful death.[12] Defendants rely on the same evidence relied upon in their brief regarding Plaintiffs' § 1983 claim for excessive force to argue that Chamberlain's death was not wrongful. But as the Court has determined that genuine issues of material fact exist concerning whether Officer Colling's decision to use deadly force was reasonable here, and Defendants provide no further evidence or argument about why this claim should be dismissed, the Court denies Defendants' Motion for Summary Judgment on Plaintiffs' wrongful death claim.

### B.      False imprisonment, NRS § 171.123

Oquendo alleges that she was detained for three hours against her will and told she would not be allowed to leave unless she gave a statement. (Dkt. no. 31 at 7.) However, the statute Oquendo brings this cause of action under, NRS § 171.123, describes the boundaries by which a peace officer may temporarily detain a person suspected of criminal behavior or of violating conditions of parole or probation. As Oquendo falls into none of these categories, this statute is not applicable to the facts of this case, and this cause of action must be dismissed.

### C.      Negligent Training and Supervision

Plaintiffs assert that LVMPD is liable for the negligent training and supervision of its employees under Nevada law.  The Court agrees with Defendants that discretionary-function immunity applies to this claim.

Although Nevada has generally waived its state immunity under NRS § 41.031, the State has retained immunity under NRS § 41.032 for officials exercising discretion. NRS § 41.032(2) states no actions may be brought against an officer of the State or its

---

[12]Defendants' Motion for Summary Judgment on Plaintiffs' negligence cause of action, count 4, is accordingly granted.

political subdivision that is "[b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty" of the officer. On its face, this statute does not immunize municipal governments or their employees because municipalities are considered independent corporations or "persons" with their own identities, not mere political subdivisions of a state.  *See Monell*, 436 U.S. at 690.  The Nevada Supreme Court, however, has implicitly assumed that municipalities are political subdivisions of the State for the purposes of applying the discretionary act immunity statute.  *See, e.g. Travelers Hotel, Ltd. v. City of Reno*, 741 P.2d 1353, 1354-55 (Nev. 1987).

In determining whether immunity applies under NRS § 41.032, the Nevada Supreme Court has adopted the general principles of federal jurisprudence as to discretionary-function immunity, holding that the actions of state officers are entitled to discretionary-function immunity if their decision (1) involves an element of individual judgment or choice and (2) is based on considerations of social, economic, or political policy. *Martinez v. Maruszczak*, 168 P.3d 720, 727, 729 (Nev. 2007).  Decisions at all levels of government, including routine decisions, may be protected by discretionary-function immunity so long as both criteria are satisfied.  *Id.* at 729.

The Supreme Court "and others have held that decisions relating to the hiring, training, and supervision of employees usually involve policy judgments of the type Congress intended the discretionary function exception to shield." *Vickers v. United States*, 228 F.3d 944, 950 (9th Cir. 2000) (*citing Gager v. United States*, 149 F.3d 918, 920-22 (9th Cir. 1998); *Nurse v. United States*, 226 F.3d 996 (9th Cir. 2000); *Burkhart v. Washington Metro. Area Trans. Auth.*, 112 F.3d 1207, 1216-17 (D.C. Cir. 1997); *Tonelli v. United States*, 60 F.3d 492, 496 (8th Cir. 1995); *Richman v. Straley*, 48 F.3d 1139, 1146 (10th Cir. 1995); *Attallah v. United States*, 955 F.2d 776, 784-85 (1st Cir. 1992)). For this reason, discretionary-function immunity applies here, and Defendants' Motion for Summary Judgment on this claim is granted.

///

## VI.   CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above.  The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the Motion.

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART as follows:

- The Motion is GRANTED as it relates to Plaintiffs' interference with familial relations, negligence, and negligent training/supervision claims, as well as Oquendo's unreasonable seizure and false imprisonment claims;
- The Motion is DENIED as it relates to all other claims.  Plaintiffs' 42 U.S.C. § 1983 claim for excessive force, municipal liability, and wrongful death, remain viable, as described herein.

DATED THIS 28th day of March 2013.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE